IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET NO. 1:25CR67 |
| v. | ) | |
| | ) | **AMENDED FACTUAL BASIS** |
| JASON NATHANIEL SPEIER | ) | |
| | ) | |

NOW COMES the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea.

This "Amended Factual Basis" is identical to the "Factual Basis" except that it refers directly to the "Amended Bill of Information" (Doc. 5) and an "Amended Plea Agreement."

This Factual Basis does not attempt to set forth all of the facts known to the United States at this time. This Factual Basis is not a statement of the defendant, and, at this time, the defendant may not have provided information to the United States about the offenses to which the defendant is pleading guilty, or the defendant's relevant conduct, if any.

By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the *United States Sentencing Guidelines* or the appropriate sentence under 18 U.S.C. § 3553(a). The defendant agrees not to object to any fact set forth below being used by the Court or the United States Probation Office to determine the applicable advisory guideline range or the appropriate sentence under 18 U.S.C. § 3553(a) unless the defendant's right to object to such particular fact is explicitly reserved below. The parties' agreement does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have agreed not to object and which are relevant to the Court's guideline computations, to 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

### Overview

1. From on or about November 18, 2022, through on or about November 14, 2023, JASON NATHANIEL SPEIER was the sole owner and President of K.I. Enterprises, Inc., doing business as "Kabens." Kabens was an unlicensed log cabin home builder operating in the Western District of North Carolina and elsewhere.

2. SPEIER held his business out as a general contracting company that contracted with customers to build European-sourced log cabin kits into turnkey residences. Neither SPEIER nor his company was actually a general contractor ("GC"), and he did not have a source of supply for European log cabin kits during this period of time. SPEIER and Kabens lacked the means, ability, and intent to perform the construction services he promised in the contracts he made with his customers. SPEIER made material misrepresentations to his customers in order to induce

them to make deposits for the construction of log cabins by Kabens.

## North Carolina's Regulatory Oversight of General Contractors

3. North Carolina regulates the general contracting industry in N.C.G.S Chapter 87.

   a. These statutes also establish North Carolina's professional licensing requirements for general contractors. Courts have observed that the purpose of the licensing statute is "the protection of the public against incompetent builders." *In re Lake Providence Properties, Inc.* 168 B.R. 876, 880 (Potter, W.D.N.C. 1994) (citing *Zickgraf Enterprises, Inc. v. Yonce*, 63 N.C. App. 166 (1983)).

   b. N.C.G.S. § 87-1 defines "General Contractors" (GC) in North Carolina. A GC is any person, firm, or corporation who for a price, fee, commission, or wage undertakes to bid upon, construct, superintend, or manage the construction of any building or structure where the cost of the undertaking is $40,000 or more ($30,000 prior to October 1, 2023). GCs often describe their projects as "turnkey," by which is meant that the contractor is responsible for managing every aspect of a project and upon completion hands a fully functional structure over to the client.

   c. N.C.G.S. § 87-2 and N.C.G.S. § 87-11 establish a State Licensing Board for GCs and give it the authority to issue, revoke, and otherwise manage the licenses of GCs.

   d. N.C.G.S. § 87-10 provides the licensing qualifications for a GC. These requirements include that the applicant must pass an examination establishing the applicant's ability to perform construction tasks, be familiar with North Carolina building codes, and demonstrate knowledge of contracting business practices, to include estimating costs and contracting ethics.

   e. This statute also permits an individual known as a "qualifier" to be the individual whose qualifications fulfill the requirements to serve as the GC licensee for a firm or corporation. This allows an individual who is already licensed as a GC to associate with a firm and provide it with the necessary GC for the entire firm to hold itself out and do business as a GC.

   f. A non-GC firm cannot legally associate with a GC in name only and then otherwise provide all contracting services through the firm without the GC's involvement. Unless a firm formally retains a qualifier by applying to the board and receiving approval of the qualifier named in an application, that firm is not authorized to operate as a GC.

   g. N.C.G.S. § 87-12 provides that only licensed GCs may contract for, bid upon construction works, or attempt to practice general contracting as enumerated in § 87-1. "License lending" is also prohibited by this statute. License lending occurs when a

    licensed GC purports to be a GC for a project that is actually performed by a non-licensee.

  h. N.C.G.S. § 87-14 regulates who can apply for and receive a building permit in North Carolina. This statute requires applicants to be a GC or the property owner. A property owner who seeks to obtain a permit without a GC must submit an affidavit attesting that they will personally superintend and manage all aspects of the construction (owner management).

### SPEIER Joins Predecessor Company Affordable Log Homes

4. In January 2020, prior to SPEIER's ownership of Kabens, R.M. founded a Kabens predecessor company known as "Affordable Log Homes" (ALH). ALH advertised the sale of log cabin home "kits" manufactured by EZ Log Structures, which ALH offered to import from Europe to Western North Carolina. In most instances, instead of the client/homeowner managing their own build, R.M. offered construction services as part of these sales deals. Neither R.M. nor ALH held a North Carolina GC license, but ALH nonetheless took on the "turnkey" construction of the cabin kits that they sold to their customers.

5. Though profitability initially seemed promising, ALH ran into delays and obstacles once the COVID pandemic took hold. R.M. hired SPEIER in August 2020 to work for ALH because SPEIER had a background in sales. As construction progress slowed during the pandemic, SPEIER made numerous sales by setting unrealistic expectations with new ALH customers. SPEIER's influence in the company grew, and R.M. gave him full control of ALH sales sometime in 2021. Throughout 2021, ALH experienced financial losses and failed to complete the cabin builds within the timeframes the company had promised to its customers. By November 2021, ALH was behind schedule on 11 cabins and approximately $200,000 in debt.

### Affordable Log Homes Rebrands as Kabens

6. In November 2021, R.M. and SPEIER sought to rebrand and reorganize ALH. On November 22, 2021, SPEIER registered a new business named "KI Enterprises Inc." which did business under the name "Kabens." R.M. and SPEIER agreed to share ownership and control of Kabens. R.M. operated the construction side of Kabens, and SPEIER oversaw sales, advertising, administration, and finances. R.M. and SPEIER continued construction on the incomplete ALH cabins under Kabens, and they used deposits for log cabins from new Kabens customers to fund the construction of existing ALH customers.

7. SPEIER started a new bank account for Kabens at First National Bank of Pennsylvania. This was the "operating account" for Kabens. SPEIER alone controlled Kaben's finances—R.M. lacked access to the account. SPEIER deposited Kabens customers' deposits into this Pennsylvania-based bank account.

8. Neither SPEIER, nor R.M., nor Kabens, nor any employee of Kabens was a GC.

### SPEIER Fraudulently Misrepresents Kabens' Ability to Complete Projects

9. SPEIER developed an alluring online marketing and social media presence for Kabens. SPEIER advertised "complete log cabin home packages" with "affordable prices," "fast construction," and "unlimited customization." SPEIER presented Kabens' products and services as turnkey builds. Much like ALH had done, Kabens thus offered the services of a GC, and held itself out as a GC, though it was not actually a licensed GC.

10. Throughout 2022, SPEIER built a sales team and led them to make numerous sales of promised log cabins to customers in North Carolina (including within the Western District of North Carolina), South Carolina, Georgia, and Tennessee. SPEIER promised his customers turnkey builds from European-sourced log cabin kits, knowing that he lacked the ability to fulfill these promises.

11. Kabens was not a GC and did not have a GC properly associated with the company through the qualifier process. SPEIER fraudulently hid this fact from customers by naming GCs who were not approved by the North Carolina General Contractor Licensing Board to work on behalf of Kabens because they had not been approved through the qualifier process. In many instances, the GC named in the contract did not perform any services at all for customers. Some of these instances amounted to license lending, while at other times SPEIER listed an individual GC's name on contracts without that GC's knowledge.

12. Kabens contracts required unusually large initial deposits, often as much as 50% or more of the total build cost. SPEIER often misrepresented the purpose of these funds to customers. Rather than use the deposits to purchase European-sourced log kits, as he sometimes promised customers, he instead applied the funds to overhead expenses, pre-existing projects, as personal profit, and for other non-Kabens related matters.

### North Carolina State Regulators Intervene

13. Beginning in 2021 and continuing into 2022, dissatisfied customers began to make formal complaints to the North Carolina Licensing Board for General Contractors ("the Board") because of a lack of progress on their builds. The Board launched an investigation into R.M.'s business practices. In May 2021, the Board first informed R.M. that he was violating North Carolina law because he and his associated companies were acting as GC's without being duly licensed. R.M. acknowledged the complaints for the first time in February 2022, yet Kabens continued operating and advertising as a GC despite the customer complaints and the investigation by the board.

14. In November 2022, R.M. resigned and departed from Kabens. Soon thereafter, R.M. agreed to a judicial consent order sought by the Board which permanently enjoined and restrained him from the unlicensed practice of general contracting in North Carolina. The order named R.M. and R.M.'s previous company, but not SPEIER or Kabens. SPEIER chose to

continue Kabens without R.M., and he assumed full control of the company as President and sole owner.

### SPEIER Continues to Fraudulently Induce Contracts Despite His Inability to Complete Projects

15. By December 2022, Kabens still had two cabins started under ALH that they had not yet completed. The company also had contracted for ten additional cabins since Kabens was formed that had made minimal or no progress towards completion.

16. After R.M.'s departure, SPEIER knew that Kabens was unable to fulfill contract commitments to construct log cabins because of at least four known circumstances:

   a. First, R.M. had been responsible for the construction side of Kabens' business. His departure meant that Kabens lacked the capability to actually build out a turnkey cabin as promised to customers in Kabens' advertising, sales discussions, and contracts.

   b. Second, Kabens lacked the finances to build. Upon R.M.'s departure, the balance of Kabens operating account was approximately *negative* $1,000. Since Kabens was behind schedule on existing builds and not due to receive additional payments until they were complete, their only means to complete old builds was to apply deposits from new sales towards the incomplete builds.

   c. Third, Kabens lost EZ Log Structures as a source of log cabin kits. Despite lacking a supplier, SPEIER and Kabens continued to advertise, promise, and contract for "European" sourced log cabin kits.

   d. Fourth, Kabens continued to operate without an approved and licensed GC. Every home that Kabens contracted to build violated North Carolina GC law. SPEIER knew that a GC was required for builds because R.M. specifically advised SPEIER that the Board informed him he could not build homes because he lacked a GC license.

17. In 2023, notwithstanding these known limitations, SPEIER continued to aggressively market Kabens and contract with new customers to build turnkey cabins. On March 2, 2023, SPEIER filed an application with the Board to obtain a license to practice general contracting. In the application, SPEIER attempted to associate T.B., an individual who was already licensed as a GC, with KI Enterprises through the Board's "qualifier" process. In April 2023, the Board denied SPEIER's application because of numerous unresolved complaints associated with SPEIER.

18. After the Board's denial of SPEIER's application, SPEIER was aware that Kabens was not profitable or sustainable, and he knew it was unlawful to run the business as though he or Kabens was a GC. SPEIER incorporated a new North Carolina business named "Big Timber Log Homes" in May 2023. SPEIER later told investigators that he did so because he had not been

5

successful at construction, and he sought to only be a supplier of kits under the new business brand. But SPEIER also told investigators that after he incorporated Big Timber Log Homes, he was still willing to contract for turnkey construction under Kabens.

19. Kabens had not completed a turnkey build since the company had been formed in November 2021. Throughout 2023, SPEIER continued to make material misrepresentations to prospective customers to induce them into contracting with Kabens and paying him large deposits. Three such customers during the summer of 2023 were Z.G., B.J., and J.S. At the time that SPEIER contracted with and accepted deposits from these customers, Kabens was dozens of cabins behind in its promised construction.

<u>The Z.G. Cabin Build - Contracted on June 23, 2023</u>
<u>Kabens Behind on Approximately 37 Customer Projects</u>

20. Z.G. was an individual who was interested in building a log cabin in Western North Carolina. In April 2023, Z.G. discovered Kabens through internet searches. Z.G. observed that the company had hundreds of YouTube videos and dozens of online Google reviews. SPEIER intended for his social media presence and his material misrepresentations of himself and his company to cause potential customers to wrongly believe that Kabens was a successful GC builder, and Z.G. did so believe. Z.G. sent an email to Kabens through the company website and began discussion about a build with SPEIER in June 2023.

21. SPEIER falsely told Z.G. that his log cabins were engineered from "Nordic Spruce." SPEIER falsely told Z.G. that "turnkey" completion by Kabens takes "about 6 months."

22. SPEIER offered Z.G. the "Baltimore" model cabin which is an EZ Log Structures cabin kit. SPEIER made this offer even though SPEIER knew that his contract with EZ Logs had been terminated since January 2023, and SPEIER in fact had no source of supply for log cabin kits. SPEIER falsely told Z.G. that he had an extra log cabin kit in stock, which fraudulently induced Z.G. to believe that the cabin could be built especially quickly because the materials did not need to be shipped from Europe.

23. SPEIER told Z.G. that he could expect clearing and grading for the home to be complete by July 2023 if Z.G. contracted with Kabens. SPEIER represented to Z.G. that Kabens was a supplier of log cabin kits. SPEIER also told Z.G. that he could provide a discount to him because he had another cabin build in close proximity to Z.G.'s proposed build. SPEIER knew all these statements were untrue, and intended the false statements to fraudulently induce Z.G. to sign a contract and provide a large deposit.

24. The false statements did induce Z.G. to sign a contract with KI Enterprises (Kabens) on June 23, 2023, for a "turnkey" build of the Baltimore model. SPEIER drafted the contract. The total price for the build was $307,000 with $184,200 required to be paid as an upfront deposit.

6

The contract listed T.B. as the "contractor" and KI Enterprises, Inc. (Kabens) as the "material supplier and subcontractor." Payments were to be made to KI Enterprises (Kabens). Salesman R.P. worked with Z.G. on the contract, but all terms and offers were dictated by SPEIER through R.P. The contract specified that the "CO" (certificate of occupancy) would be "achieved" by January 1, 2024, or else the customer would receive $250/week in compensation.

25. Later, on June 23, 2023, Z.G. wired $40,000 to KI Enterprises (Kabens) in interstate commerce, and Z.G. agreed to send additional funds once he liquidated an investment account. On June 24, 2023, SPEIER texted Z.G. and said he had "good news" in that he "got the order confirmed with the plant and would be saving $1,200 on shipping" so he would pass that $1,200 savings on to Z.G. There was in fact no such "plant." SPEIER did not have a log cabin kit on hand already, he was not then actually a log cabin kit supplier, and he never placed an order for Z.G.'s log cabin kit. SPEIER falsely represented to Z.G. that making payment to SPEIER would cause SPEIER to order or provide materials for his build, including ordering and acquiring his log cabin kit.

26. SPEIER texted Z.G. on June 28, 2023, and said that "the mill" was requesting an update because they were preparing to ship. During this period, at SPEIER's direction, salesman R.P. emailed Z.G. and provided a detailed timeline of the build, indicating that grading would be completed in July and the exterior would be completed in November. SPEIER continued to directly inquire with Z.G. concerning when he would send the remaining contracted deposits. Z.G. then sent SPEIER a $25,000 wire in interstate commerce on July 5, 2023, and another such $25,000 wire on July 6, 2023. Relying on SPEIER's material misrepresentations, Z.G. falsely believed that SPEIER would build a cabin for him in approximately six months.

27. On July 7, 2023, SPEIER texted and asked about the next $25,000 wire. SPEIER told Z.G. he wanted to "continue to purchase materials and line up all subs … as we work towards getting you a certificate of occupancy by end of year." Z.G. then advised that he had already sent another $25,000 wire on July 7, 2023. SPEIER then sent a text to Z.G. that said "deposit sent to supplier on log kit. Balance will be sent upon your next wire and I'll finish paying for entire package…" SPEIER made this false statement to induce Z.G. to send yet another additional payment.

28. Later on July 7, 2023, Z.G. discovered an extremely negative online review left by another Kabens customer. Z.G. reached out to SPEIER with concerns about the vitality of his build. SPEIER assured Z.G. that the negative review was unfairly given and there should be no concerns. SPEIER then reduced the initial deposit due by $30,000. SPEIER then provided Z.G. with a referral to M.S., whom he represented as a "current customer" who was building a "3/2" (meaning a 3 bedroom, 2 bath cabin) and who would be willing to share her experience. M.S. was, in fact, a paid salesperson whose status as an employee was not disclosed to Z.G. M.S. falsely told Z.G. she was currently building a cabin with Kabens and provided reassurance to Z.G. that SPEIER was a great builder. M.S. told Z.G. that SPEIER had been especially understanding about change orders once her cabin build had begun. In fact, M.S. never contracted for or built a cabin with SPEIER. Based on SPEIER's representations and the referral

7

to M.S., Z.G. believed that Kabens was actively constructing cabins and that real customers were satisfied with the company.

29. After being assured by M.S. and receiving SPEIER's assurance that Z.G.'s additional deposit would result in an order for materials, on July 12, 2023, Z.G. then sent an additional wire in interstate commerce to KI Enterprises (Kabens) for $38,000.

30. T.B. was never involved in the project and was unaware that he had been listed on the contract as the GC. No work was ever completed on the build. SPEIER's misrepresentations concerning Kabens' ability and intent to construct a cabin tricked Z.G. into entering into a contract and making payments to SPEIER. SPEIER did not construct a cabin for Z.G.

### The B.J. Cabin Build - Contracted on July 14, 2023
### Kabens Behind on Approximately 38 Customer Projects

31. In 2023, B.J. owned a piece of property in Saluda, North Carolina where he desired to build a log cabin. B.J. discovered Kabens through internet research and he entered into sales conversations with J.G., a salesman employed by Kabens. J.G. was directed by SPEIER at all times during his conversations with B.J. J.G's conversations with B.J. held out Kabens as a GC and a material supplier of European-sourced log cabin kits. Based on these material misstatements, SPEIER induced B.J. to contract with Kabens to build a "Saluda" model cabin.

32. SPEIER drafted the contract for B.J.'s cabin build. B.J. signed the contract with Kabens on July 14, 2023. The contract purported to be between B.J., KI Enterprises, Inc (Kabens) "as material supplier," and T.B. as "General Contractor." T.B., as SPEIER well knew, was not involved with, and was totally unaware of, the project. SPEIER forged T.B.'s signature on the contract. The contract provided a discount for a "TANDEM BUILD." SPEIER included this term because he intended to make B.J. believe that Kabens was a valid builder with other ongoing projects besides his own. The contract stated "Estimated completion time 6-9 Months." The contract specified that once B.J. made a 60% down payment of the cabin material package costs, Kabens would start the "ordering, design, and permitting process in addition to the foundation work." The contract also specified that the remaining 40% of the material costs would be "due once ready to ship from Europe." The contract specified that all payments were to be made to KI Enterprises.

33. B.J. wired a $97,298.47 deposit in interstate commerce to Kabens on July 14, 2023. Prior to this wire, the Kabens bank account balance was approximately $1,000. SPEIER intended for his sales discussions with B.J. to cause him to believe that payment of his deposit would cause SPEIER to order a cabin kit from overseas, but SPEIER knew that he had no overseas supplier.

34. SPEIER represented that construction would begin in September 2023, but SPEIER never started the project. SPEIER's misrepresentations concerning Kabens' ability and intent to construct a cabin tricked B.J. into entering into a contract and making payments to SPEIER. SPEIER did not construct a cabin for B.J.

8

### The J.S. Build - Contracted on August 22, 2023
### Kabens Behind on Approximately 40 Customer Projects

35. J.S. owned a piece of property in Sylva, North Carolina, where he desired to build a log cabin. J.S. discovered Kabens online through internet research in the summer of 2023. M.B. was a salesman for Kabens who initially reached out to J.S. on August 13, 2023, about building a log cabin with Kabens. J.S. and M.B. communicated about the build via text message, but the information that M.B. shared with J.S. was supplied by SPEIER. M.B. told J.S. that Kabens is a "turnkey" builder who can complete a build in eight months. Based on these representations, SPEIER induced J.S. to believe that Kabens was a GC who could build a complete log cabin in a short period of time.

36. J.S. expressed interest in a cabin model known as an "Inio," which Kabens advertised on Kabens' Facebook page. M.B. provided photos of this model to J.S. from a Google Drive account established by SPEIER. M.B. represented to J.S. that the photos were of a recently completed build by Kabens because SPEIER led M.B. to believe so. In fact, Kabens did not build the cabin depicted in the photos. SPEIER intended for these material misrepresentations to cause J.S. to believe that Kabens had built an Inio model cabin and J.S. did believe so.

37. M.B. told J.S. that Kabens is "a dealer for multiple log home providers" and that they have "multiple general contractors all over the southeast." Based on instruction from SPEIER, M.B. told J.S. that payment of the full initial deposit would pay for the materials of his build. This representation was false. These misrepresentations further assured J.S. that Kabens was a GC and could supply log home materials.

38. SPEIER drafted the contract for J.S.' cabin build. On August 22, 2023, J.S. signed the contract to build a cabin with Kabens - making him the last Kabens customer. J.S.'s contract specified a "Turn Key Build" of a cabin for a total price of $283,257. The contract specified an approximately 42% deposit made with an initial payment of $25,000 and then three additional later scheduled deposit payments of $47,188.27 each. The contract listed the parties as J.S. (owner), KI Enterprises, Inc (Kabens) (Material supplier), and T.B. (General Contractor). The contract specified that all payments were to be made to KI Enterprises.

39. After signing the contract, SPEIER directed M.B. to inquire about the additional deposits and SPEIER linked receipt of J.S.'s deposits to the ordering of materials. SPEIER intended for these representations to cause J.S. to believe that upon payment of the full deposit, Kabens would order logs and other materials for his cabin build.

40. J.S. wired a $25,000 deposit in interstate commerce to Kabens on August 23, 2023.

41. J.S. wired an additional deposit of $47,188.27 in interstate commerce to Kabens on September 1, 2023.

9

42. On September 6, 2023, after receiving J.S.'s first two deposits, SPEIER told M.B. to move J.S.'s project forward in "little ways that he [J.S.] can see." To this end, SPEIER directed M.B. to stake the expected corners of the build site. M.B. was not a surveyor and he did not have any home construction or surveying expertise. In a text message, M.B. told J.S. he was planning to stake the corner stakes in the ground at the build site.

43. J.S. wired an additional $47,188.27 deposit in interstate commerce to Kabens on September 8, 2023. That same day, after receipt of J.S.'s deposit, SPEIER wired $30,000 to a friend as a personal loan.

44. On September 14, 2023, J.S. followed up and asked M.B., "You going out to the property today to stake it out?" M.B. responded that he would do so soon. Thereafter, on September 15, 2023, J.S. wired the final $47,188.27 deposit to Kabens. The next day, M.B. placed stakes on J.S.' property and sent him a text message with a photo of the scene.

45. SPEIER did not order materials with J.S.' deposit money. SPEIER did not have a material supplier for J.S. SPEIER did not provide a GC to J.S. T.B. was not involved in the project. SPEIER did not construct a cabin for J.S.

46. SPEIER's misrepresentations concerning Kabens' ability and intent to construct a cabin tricked J.S. into entering into a contract and making payments to SPEIER.

47. From the time that SPEIER took over Kabens on November 18, 2022, through October 1, 2023, he accepted payments from 24 customers. These payments totaled approximately $2,355,310.24.

48. During this period, SPEIER also continued to accept payments from 8 customers who contracted with Kabens prior to November 2022. These deposits totaled approximately $211,412.01.

49. The total customer payments received by SPEIER after November 18, 2022, was approximately $2,566,722.25. All such payments moved in interstate commerce.

[Handwritten annotation: Customer J.S.'s wire sent these funds to SPEIER's First National Bank of Pennsylvania business checking account with account number ending in 6143, an account held and controlled by SPEIER. The funds moved in interstate commerce. — DAT, TJB, JNS]

RUSS FERGUSON
UNITED STATES ATTORNEY

DAVID A. THORNELOE
ASSISTANT UNITED STATES ATTORNEY

10

### Defendant's Counsel's Signature and Acknowledgment

I have read this Amended Factual Basis, the Amended Plea Agreement, and the Amended Bill of Information in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Amended Factual Basis, the Amended Plea Agreement, and the Amended Bill of Information. I hereby certify that the defendant does not dispute this Amended Factual Basis with the exception of those facts to which I have specifically reserved the right to object, and understands that it may be used for the purposes stated above.

_____  DATED: 10/20/25
Ted J. Besen, Attorney for Defendant

11